IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE SEARCHES OF:

| | | |
|---|---|---|
| One (1) Apple iPhone, Model A1586, IMEI 355402079476692 | ) ) | Magistrate No. 18-1024 [UNDER SEAL] |
| One (1) Apple iPhone S, Model A1633, FCC ID BCG-E2946A | ) ) | Magistrate No. 18-1023 [UNDER SEAL] |
| One (1) Apple iPhone X in brown leather case | ) ) | Magistrate No. 18-1025 [UNDER SEAL] |

## **AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS**

## **INTRODUCTION**

I, Eric C. Goucher, being duly sworn, depose and state that:

1. I am a Special Agent ("SA") of the United States Department of Justice, Federal Bureau of Investigation ("FBI"), and have been so employed since April 2015. During that time, I have been assigned to an investigative unit in the Western District of Pennsylvania dealing with organized crime, drug trafficking, gangs, and violent crimes. During my training at the FBI Academy in Quantico, Virginia, I received extensive training in a variety of investigative and legal matters, including the topics of Fourth Amendment searches and the legal requirements for the interception of telephone communications.

2. As a Special Agent with the FBI, I am an "Investigative or Law Enforcement Officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516. I am also a "Federal law enforcement officer" within the meaning of Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure.

3. This Affidavit is submitted in support of search warrants for three cellular telephones (hereinafter occasionally referred to as "SEARCH LOCATIONS") associated with DANNY JACKSON ("JACKSON"), who, as detailed below, has trafficked cocaine from Philadelphia to the Western District of Pennsylvania ("WDPA"). Accordingly, law enforcement has probable cause to believe that a search of these cellular telephones will produce fruits of, or evidence of, violations of Title 21, United States Code, Sections 841(a)(1) and 846.

4. Your Affiant has personally participated in the investigation outlined herein. In addition, your Affiant has reviewed information obtained from law enforcement and commercial databases, and has discussed this case with, and reviewed the reports of, other law enforcement officers who have been involved in this investigation or who have investigated JACKSON and his associates.

5. This Affidavit is being submitted for the limited and specific purpose of supporting an application for search warrants. Your Affiant has not, therefore, included every fact known to him concerning the investigation.

6. As explained below, there is probable cause to conclude that evidence of illegal narcotics trafficking will be found in the cellular phones which are the subject of these search warrants.

**SEARCH LOCATIONS FOR THIS AFFIDAVIT**

7. Your Affiant is seeking search warrants for the following cellular telephones:

- One (1) Apple iPhone, Model A1586, IMEI 355402079476692
- One (1) Apple iPhone S, Model A1633, FCC ID BCG-E2946A
- One (1) Apple iPhone X in brown leather case

All three above-described cell phones were lawfully seized by law enforcement officers during the execution of a search warrant on July 17, 2018, at 530 William Penn Place, Room 858, Pittsburgh, PA, the temporary lodging of JACKSON at the time.

**TRAINING AND EXPERIENCE**

8. Your Affiant has been a Special Agent with the FBI for over three years, and is currently assigned to the Greater Pittsburgh Safe Streets Task Force ("GPSSTF"). During your Affiant's assignment with the GPSSTF, your Affiant has been assigned to investigations targeting street gangs and other organizations involved in drug trafficking offenses in the WDPA. While being trained as a Special Agent of the FBI, your Affiant received basic drug training at the FBI Academy located in Quantico, Virginia.

9. Your Affiant has been involved in narcotics-related arrests and the execution of search warrants which resulted in the seizure of narcotics and has assisted in the supervision of activities of informants who provided information and assistance resulting in drug buys. During the course of your Affiant's training and experience, your Affiant has become familiar with the methods and techniques associated with the distribution of narcotics, the laundering of drug proceeds, and the organization of drug conspiracies. In the course of conducting these investigations, your Affiant has been involved in the use of the following investigative techniques: interviewing informants and cooperating witnesses, conducting physical surveillance, conducted consensual monitoring and recording of both telephonic and non-telephonic communications, analyzing pen register data, conducting court-authorized wire and oral interception electronic surveillance, and preparing and executing search warrants which have led to substantial seizures of narcotics, firearms, contraband, and other evidence of criminal activity.

10. Your Affiant is aware, based upon my training and experience, that the following kinds of evidence have been recovered in a substantial number of cellular telephone searches executed in connection with drug trafficking investigations:

   a. Contact lists, including telephone numbers and names associated with those numbers;

   b. Incoming and outgoing call logs;

   c. Incoming and outgoing text messages, including draft text messages;

   d. Photographs;

   e. Videos; and

   f. Instant Messaging.

11. Based upon your Affiant's training and experience, as well as the collective knowledge and experience of other agents and officers associated with this investigation, your Affiant is aware that it is common practice for drug traffickers to routinely utilize telephones, cellular phones, prepaid phones, text messaging, and coded communications to communicate with their customers, suppliers, couriers, and other. Moreover, it is not unusual for them to initiate such cellular or prepaid phone service in the name of an associate or family member or in the name of a fictitious individual. These individuals often require the use of a telephone facility to negotiate times, places, schemes, and manners for importing, possessing, concealing, and distributing controlled substances and for arranging the disposition of proceeds derived from the sale of controlled substances.

12. Evidence of drug crimes can be found in electronic media such as cellular phones. Such evidence can include internet searches for drug-related paraphernalia, addresses, telephone numbers and contacts, as well as incriminating communications via emails, instant messages, or

4

text messages. It should be noted that, with the advance of technology, the distinction between computers and cellular phones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging, can now be performed from many cellular phones. In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular phones and computers. Contemporaneous possession of multiple cellular phones is, therefore, evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular phones can be evidence of drug trafficking, particularly in a case involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events. As with most electronic/digital technology items, communications made from an electronic device, such as a cellular phone, are often saved or stored on the device.

13. Your Affiant's awareness of these drug trafficking practices, as well as your Affiant's knowledge of drug use and distribution techniques as set forth in this Affidavit, arise from the following: a) your Affiant's involvement in prior drug investigations and searches during his career, as previously described; b) your Affiant's involvement on a number of occasions in debriefing confidential informants and cooperating individuals in prior drug investigations, as well as what other agents and police officers have advised your Affiant of when relating the substance of their similar debriefings and the results of their own drug investigations; c) discussions with members of the FBI and/or other federal, state, and local law enforcement officers, both about the facts of this case in particular and about trafficking in general; and d) other intelligence information provided through law enforcement channels.

## BACKGROUND OF INVESTIGATION AND
## PROBABLE CAUSE IN SUPPORT OF SEARCH WARRANTS

14. Since April 2018, your Affiant, along with other Special Agents and Task Force Officers of the FBI and Drug Enforcement Administration ("DEA") and other federal agencies and local law enforcement officers, have been involved in an investigation of JACKSON, his co-conspirator, SEBASTIAN VELAZQUEZ ("VELAZQUEZ"), and others for high-volume cocaine trafficking, including in the WDPA. As set forth below, JACKSON and VELAZQUEZ have traveled to the Pittsburgh area to distribute kilogram quantities of cocaine on multiple occasions from in and around October 2017 through July 2018. During their trips to supply cocaine in Pittsburgh, JACKSON and VELAZQUEZ have utilized hotels located in the downtown area to facilitate the distribution of cocaine to other traffickers based in the area. During that timeframe, JACKSON lived in Philadelphia and traveled by bus to Pittsburgh to distribute cocaine. Based upon my training, experience, and from information obtained from other law enforcement sources, your affiant knows that Philadelphia is a source city of controlled substances for the Pittsburgh area.

15. On July 2, 2018, investigators received judicial authorization to obtain GPS/E911 location data for a phone subscribed to and used by JACKSON. The information obtained pursuant to the court order enabled investigators to track the movement of the phone and JACKSON.

16. An analysis of JACKSON'S call detail records ("CDR") confirms that he communicates via cell phone with VELASQUEZ. An analysis of VELASQUEZ'S CDR reveals contact with several telephone numbers in the Pittsburgh area at times when VELASQUEZ has been in the Pittsburgh area. One of the Pittsburgh numbers with which VELASQUEZ'S phone was in contact has also been in contact with targets of multiple FBI Pittsburgh wiretap investigations from the past year, to include active investigations. Three of the Pittsburgh numbers

have been identified as being associated with the following known drug traffickers: Joseph FAZIO ("FAZIO"), John Charles MERCER III ("MERCER"), and Rashad DAVISON ("DAVISON").

17. Records obtained from the Hotel Monaco and the Omni William Penn Hotel reveal that on several occasions between April and July 2018, VELASQUEZ and JACKSON have reserved rooms in the same hotels at the same time. Most recently, JACKSON and VELASQUEZ both reserved rooms at the Omni William Penn. During the time that both men were in Pittsburgh, agents were able to conduct extensive surveillance of the two, as described below.

18. On July 15, 2018, GPS/E911 data for JACKSON'S phone reflected that he had traveled to Pittsburgh the previous evening. Hotel records revealed that JACKSON checked into Room 858 at the Omni William Penn on July 15 and was scheduled to check out on July 20, 2018. The reservation was booked in JACKSON'S name.

19. Also, on July 15, 2018, GPS/E911 data for VELASQUEZ'S phone indicated that VELASQUEZ was flying from Miami, FL to Pittsburgh, PA, with a connecting flight in Charlotte, NC. Surveillance teams were stationed at the Pittsburgh International Airport and in the vicinity of the hotels frequented by VELASQUEZ and JACKSON. Surveillance officers at the airport confirmed VELASQUEZ'S arrival in the Pittsburgh area, and agents followed him as he traveled to downtown Pittsburgh. Surveillance officers situated in the area of the Omni William Penn and Hotel Monaco saw VELASQUEZ check into the Omni William Penn and head upstairs. Hotel records reflect that on July 15, 2018, VELASQUEZ checked into the Omni William Penn and stayed in Room 606. VELASQUEZ was scheduled to check out on July 18, 2018.

20. Shortly after VELASQUEZ checked into the hotel, investigators saw JACKSON exit the Omni William Penn and walk down Liberty Avenue.

21. Investigators then saw VELASQUEZ exit the Omni William Penn carrying a backpack and a suitcase. A silver Toyota Camry, registered to MERCER, pulled up and VELASQUEZ placed the backpack into the car. MERCER exited the vehicle, briefly spoke to VELASQUEZ, and then drove away.

22. Afterwards, a silver Chevrolet Malibu, which had been rented by FAZIO, pulled up to the hotel.[1] VELASQUEZ placed the suitcase into the car's trunk and entered the car via the passenger side. The Malibu then drove away. Investigators attempted to follow the vehicle but were unsuccessful. Before investigators could locate the car, GPS/E911 location data for VELASQUEZ'S cell phone placed him back at the Omni William Penn, 15 to 30 minutes after his initial departure.

23. Based upon these observations and from the other information obtained during the investigation, your affiant believes that VELASQUEZ'S backpack and suitcase contained cocaine, which he transferred to MERCER and FAZIO.

24. Also, on July 15, 2018, investigators saw JACKSON in the vicinity of the Greyhound Bus Station in downtown Pittsburgh. He was observed entering a bus at approximately 10:30 p.m. GPS/E911 location data for JACKSON'S phone subsequently indicated that his bus was traveling eastbound on the Pennsylvania Turnpike. He arrived in Philadelphia on the morning of July 16, 2018.

25. During the morning of July 16, 2018, surveillance officers observed FAZIO driving the Chevrolet Malibu on the streets surrounding the Omni William Penn. Eventually, FAZIO

---

[1] Records obtained from the Hertz Corporation show that from July 16-18, 2018, FAZIO rented a silver Chevrolet Malibu, bearing Pennsylvania license plate KSW 0089.

8

stopped and VELASQUEZ exited the car. VELASQUEZ was carrying a suitcase and entered the hotel. FAZIO drove away.

26. Afterwards, MERCER arrived at the Omni William Penn driving a blue Chevrolet Silverado. MERCER met with VELASQUEZ outside the hotel. Surveillance officers saw MERCER lower the vehicle's tailgate, remove a backpack and a suitcase from the rear area of the vehicle, and hand the suitcase and backpack to VELASQUEZ. VELASQUEZ took the backpack and the suitcase into the hotel. A surveillance officer saw VELASQUEZ take the luggage into Room 606.

27. Again, based upon these observations and from other information obtained during the investigation, your Affiant believes that transactions observed between VELASQUEZ and MERCER and between VELASQUEZ and FAZIO involved drug trafficking.

28. At approximately 7:30 a.m. on July 17, 2018, investigators saw JACKSON arrive back in Pittsburgh via a Greyhound Bus and walk to the Omni William Penn Hotel. JACKSON had a large black wheeled suitcase in his possession. Based upon my training and experience, your Affiant knows that a short turn-around trip like that is consistent with narcotics trafficking.

29. At approximately 9:30 a.m., MERCER arrived at the Omni William Penn in the silver Camry. VELASQUEZ exited the hotel carrying a black backpack and entered the car, which then drove away from the hotel. The Camry drove around the area of the hotel, and after a few minutes, VELASQUEZ was dropped off near the hotel. VELASQUEZ walked down an alley and MERCER drove away. Based upon the manner by which MERCER operated his vehicle, it appeared to surveillance officers that he had detected the surveillance and was trying to throw the officers off his trail. At one point, MERCER pulled over with his blinker lights on. He then made

an illegal U-turn on or near Grant Street, and drove away. Surveillance officers attempted to follow, but were unsuccessful due to vehicular and pedestrian traffic.

37. On July 17, 2018, Chief United States Magistrate Judge Maureen P. Kelly issued warrants authorizing searches of VELASQUEZ'S and JACKSON'S rooms at the Omni William Penn Hotel as well as for a house associated with FAZIO in the Mt. Washington neighborhood of Pittsburgh, PA.

38. During the search of JACKSON'S hotel room, investigators seized approximately five kilograms of a substance believed to cocaine from a black suitcase; multiple cellular phones; and financial documents, including Western Union receipts. During the search of VELASQUEZ'S hotel room, investigators recovered between $20,000 and $25,000 in cash and two cellular phones. During the search of FAZIO'S house, agents recovered indicia of occupancy for FAZIO; a money counter; and between $20,000 and $25,000 in cash.

41. As reflected above, when JACKSON arrived in Pittsburgh on July 17, 2018, he was in possession of large wheeled black suitcase. This suitcase was not found in JACKSON'S hotel room during the search. Prior to the execution of the search warrant, surveillance officers saw JACKSON leave the hotel with the suitcase and a backpack. When JACKSON returned to the hotel, the suitcase was no longer in his possession. Through surveillance and GPS/E911 location data, agents were able to retrace JACKSON'S travel and whereabouts throughout the day. Agents ascertained a specific address where JACKSON had been earlier in the day. Agents obtained consent to search that location from a resident of the location. During the consent search, agents located and seized the aforementioned black wheeled suitcase, which contained in excess of $500,000 in cash.

42. On July 18, 2018, Magistrate Judge Kelly issued a criminal complaint, at Mag. No. 18-953, charging DANNY JACKSON and SEBASTIAN VELAZQUEZ with conspiracy to possess with intent to distribute and distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846. JACKSON is currently being held without bond at the Allegheny County Jail on the charge in the Complaint.

## **CONCLUSION**

42. Based upon all of the foregoing, there is probable cause to conclude that, in the WDPA, JACKSON has engaged in drug trafficking and there is probable cause to believe that evidence of this crime will be found upon searching the SEARCH LOCATIONS.

43. The above information is true and correct to the best of my knowledge, information and belief.

_____
ERIC C. GOUCHER
Special Agent, FBI

Sworn and subscribed before me,

this _____ day of August 2018.

_____
ROBERT C. MITCHELL
United States Magistrate Judge

## ATTACHMENT A-1

(Search Location 1: One (1) Apple iPhone, Model A1586, IMEI 355402079476692)

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Search Location 1 was lawfully obtained by law enforcement during the execution of a search warrant at 530 William Penn Place, Room 858, Pittsburgh, PA on July 17, 2018. Search Location 1 is currently in the lawful custody of the FBI at the Pittsburgh Field Office, 3311 East Carson Street, Pittsburgh, PA 15203.

## ATTACHMENT A-2

(Search Location 2: One (1) Apple iPhone S, Model A1633, FCC ID BCG-E2946A)

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Search Location 2 was lawfully obtained by law enforcement during the execution of a search warrant at 530 William Penn Place, Room 858, Pittsburgh, PA on July 17, 2018.

Search Location 2 is currently in the lawful custody of the FBI at the Pittsburgh Field Office, 3311 East Carson Street, Pittsburgh, PA 15203.

## ATTACHMENT A-3

(Search Location 3: One (1) Apple iPhone X in brown leather case)

**DESCRIPTION OF LOCATION TO BE SEARCHED**

Search Location 3 was lawfully obtained by law enforcement during the execution of a search warrant at 530 William Penn Place, Room 858, Pittsburgh, PA on July 17, 2018. Search Location 3 is currently in the lawful custody of the FBI at the Pittsburgh Field Office, 3311 East Carson Street, Pittsburgh, PA 15203.

# ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

All records, fruits, and evidence relating to violations of: Title 21, United States Code, Sections 841(a)(1) and 846, including those items described in Section I below.

## SECTION I

1. Records relating to the distribution of controlled substances, travel for the purpose of acquiring and/or distributing controlled substances, and to monetary transactions involving the proceeds from the sale of controlled substances;

2. Names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances and the criminal use of communication facilities;

3. Records indicating travel in interstate and foreign commerce, such as maps, GPS coordinates, navigation coordinates, travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills and related communications;

4. Records which provide evidence of control or ownership of the communication devices;

5. Records related to acquiring and distributing illegal drugs and proceeds, including incoming and outgoing call and text message logs, contact lists, photo and video galleries, sent and received text messages, online searches and sites viewed via the internet, online or electronic communications sent and received (including email, chat, and instant messages), sent and received audio files, navigation, mapping, and GPS files, telephone settings (including contact lists), and related identifying information such as telephone identification numbers, call forwarding information, messages drafted but not sent, and voice messages;

6. Any documentation, operating logs and reference manuals regarding the operation of the storage devices;

7. Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the storage devices or data to be searched;

8. Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the storage devices or data;

9. Any passwords, password files, test keys, encryption codes or other information necessary to access the storage devices or data.

**Section II**

The examination of electronic information may require authorities to employ techniques, including but not limited to, computer-assisted scans of the entire medium, which might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.